

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

Christopher M. Rigali
*Assistant United States Attorney*
*Christopher.Rigali@usdoj.gov*

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4831
MAIN: 410-209-4800
FAX: 410-962-0716

November 12, 2021

David W. Fischer, Esq.
Fischer & Putzi, P.A.
7310 Ritchie Hwy, Glen Burnie, MD 21061

   Re: United States v. Desmond Babloo Singh, Criminal No. RDB-21-116

Dear Counsel:

  This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Desmond Babloo Singh (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **December 3, 2021**, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense of Conviction

1. The Defendant agrees to plead guilty to Counts One and Two of the Indictment, which charge him with Cyberstalking in violation of 18 U.S.C. § 2261A(2). The Defendant admits that he is, in fact, guilty of the offenses and will so advise the Court.

### Elements of the Offense

2. The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Indictment, in the District of Maryland, the Southern and Eastern Districts of New York, and elsewhere, the Defendant,

  a. With the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person;

  b. Used the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce;

  c. To engage in a course of conduct;

  d. That placed that person in reasonable fear of the death of or serious bodily injury to a person, a pet, a service animal, an emotional support animal, or a horse **or** causes,

2021 DEC 10 AM 12:09
RECEIVED-MAIL ROOM
TORNEY, D.
BALTIMORE, MARYLAND

attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person.

## Penalties

3. The maximum penalties provided by statute for the offense(s) to which the Defendant is pleading guilty are as follows:

| CT. | STATUTE | MAND. MIN. IMPRISON-MENT | MAX IMPRISON-MENT | MAX SUPERVISED RELEASE | MAX FINE | SPECIAL ASSESS-MENT |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 2261A(2) | N/A | 5 years | 3 years | $250,000 | $100 |
| 2 | 18 U.S.C. § 2261A(2) | N/A | 5 years | 3 years | $250,000 | $100 |

a. **Prison:** If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. **Supervised Release:** If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment up to the entire original term of supervised release if permitted by statute, followed by an additional term of supervised release.

c. **Restitution:** The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

b. **Payment:** If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

c. **Collection of Debts:** If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

    a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

    g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agrees that the applicable guidelines are as follows:

a. This Office and the Defendant agree that the applicable base offense level is **18** pursuant to U.S.S.G. § 2A6.2.

b. This Office and the Defendant agree that the offense level is increased by **2 levels** under U.S.S.G. § 2A6.2 because the offense involved a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim.

c. This Office and the Defendant agree that the base offense level is further increased by **2 levels** under the grouping rules in Section 3D of the Guidelines, as the offenses involved two distinct victims.

d. This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is

untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a Career Offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

10. This Office and the Defendant **agree to jointly recommend that the Court impose a 3-year term of supervised release** as part of the Defendant's sentence. The parties further agree to jointly recommend that the Court impose the conditions listed below as conditions of the Defendant's supervised release. Nothing about this agreement shall prevent the Court from imposing additional or other conditions of supervised release, and the parties are free to advocate for or against other conditions of supervised release (other than the mandatory and standard conditions and the conditions set forth immediately below).

   a. The Defendant shall, for the duration of his term of supervised release, participate in a mental health program approved by the U.S. Probation Office.

   b. The Defendant shall not contact either of the two victims that were the subject of his cyberstalking activity or any of the victims' family members or relatives. If the Defendant has contact with any of these individuals, he shall report any such contained to his probation officer within 24 hours.

   c. The Defendant shall refrain, for the duration of his term of supervised release, from using social media or online messaging forums, except forums or media approved in advance by the U.S. Probation Office as necessary to participate in a formal educational program, such as a degree or certificate program, or to engage in medical, legal, or religious services. If engaging in activity approved by his

probation officer, the Defendant shall refrain from posting about or discussing either of the victims, their family members, or relatives.

   d. The Defendant must allow the probation officer to install computer monitoring software on any computer (as defined in 18 U.S.C. § 1030(e)(1)) he uses.

   e. To ensure compliance with the computer monitoring condition, the Defendant must allow the probation officer to conduct initial and periodic unannounced searches of any computers (as defined in 18 U.S.C. § 1030(e)(1)) subject to computer monitoring. These searches shall be conducted for the purposes of determining whether the computer contains any prohibited data prior to installation of the monitoring software; to determine whether the monitoring software is functioning effectively after its installation; and to determine whether there have been attempts to circumvent the monitoring software after its installation. The Defendant must warn any other people who use these computers that the computers may be subject to searches pursuant to this condition.

## Waiver of Appeal

11. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

   a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute.

   b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

      (i) The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

      (ii) This Office reserves the right to appeal any sentence below a statutory minimum.

   c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Defendant's Conduct Prior to Sentencing and Breach

12.  a.      Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

   b.      If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement; and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein.

### Court Not a Party

13.    The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

14.    This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

   If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek L. Barron
United States Attorney

By: *Chris M. Rig* (signature)
Christopher M. Rigali
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

11/22/2021                                  *Desmond Singh* (signature)
_____                              _____
Date                                        Desmond B. Singh

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises that he understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

12/14/21                                    *David W. Fischer* (signature)
_____                              _____
Date                                        David W. Fischer, Esq.

# ATTACHMENT A
# STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The Defendant, Desmond Babloo Singh, knew Victim 1, "A.B.," as a former classmate of his older sister. No later than January or February of 2020, Singh, who was living in New York, had developed a romantic interest in A.B., which he expressed to A.B. in a number of online communications around Valentine's Day, 2020. A.B. told Singh that she was not interested in him romantically and ultimately asked Singh not to contact her. Singh responded by commencing a months' long cyberstalking campaign against A.B. and G.D., the latter of whom Singh perceived to be a romantic rival of sorts. Singh's course of conduct with respect to A.B. and G.D. caused or attempted to cause substantial emotional distress to both A.B. and G.D.

### *Singh's Cyberstalking Campaign Against Victim 1*

Beginning on approximately April 18, 2020, and continuing through at least November 24, 2020, Singh used more than one hundred different social media, electronic communication, and phone accounts to create harassing communications targeted at A.B., who resided in Maryland. These communications, which numbered in the hundreds and included public posts, private social media messages, text messages, and other online postings, included express and implied threats of death and bodily injury, sexualized violence, and racial slurs. *Many* of the accounts created and used by Singh incorporated A.B.'s true name, making it appear as if the accounts were owned and operated by her. For example, Singh used a social media account he created—which incorporated A.B.'s name—to send A.B. an image of several individuals hanging from nooses; Singh superimposed the faces of A.B. and her parents on the hanged individuals. Singh used another social media account—which likewise used A.B.'s name—to post a picture of a mourning family at a grave site, in which Singh superimposed the face of A.B.'s mother over the face of the grieving mother. Another theme of Singh's posts, which were made from accounts using A.B.'s name, was the assertion that A.B. was "obsessed" with Singh. Singh frequently used images of A.B. in his harassing communications, in which he denigrated her character and appearance.

A.B. pleaded with Singh to cease the harassment, which pleas went unheeded. In or about May 2020, A.B. told Singh over text message that if he didn't stop harassing her, she would seek a no-contact order. Singh responded on or about May 30, 2020, stating: "[E]xpect a wave of the worst possible s*** to happen to you lmao." On or about June 2, 2020, Singh added: "[Y]ou think im kidding im genuinely never going to stop[,] it's going to be really funny[,] your f****** fat a** thought you could f*** with me like this lmfao."

In furtherance of his harassment campaign against A.B., Singh sought to solicit others to harass A.B. as well. One method Singh employed was "doxing" A.B. by posting her personal information online. In one online posting, for example, Singh shared A.B.'s name, birth date, personal phone number, school, social media identities, and other identifying information, accompanied by the text: "UGLY [RACIAL SLUR] GIRL PLS DO MORE TO HER."

On or about July 19, 2020, A.B. received a "follow" request on a social media platform from an account Singh created. Singh had posted on this account pictures of A.B. and her family

home. Through this account, Singh also posted A.B.'s parents' address in Maryland and stated there would be a party there the following day. The following day, July 20, 2020, a Baltimore County Police Department employee received an anonymous email telling law enforcement to investigate "ASAP" a possible bomb at the parents' home. Law enforcement officers responded to the residence only to learn that the bomb threat was a hoax. The federal investigation into Singh's conduct revealed that Singh had solicited another individual to "swat" A.B.'s parents' home.

Finally, a component of Singh's harassment of A.B. was his hacking of several of A.B.'s social media accounts. Specifically, on or about July 19, 2020, Singh gained unauthorized access to A.B.'s Snapchat account and changed the email address associated with the account to an email account created and controlled by him. And on November 23, 2020, Singh gained unauthorized access to A.B.'s TikTok account and changed the email address associated with the account. Once in control of the TikTok account, Singh posted several pictures of himself with the caption "omg he's so hot!!!"

Among other evidence recovered by federal investigators were "notes" found in Singh's smart phone after his arrest. Among other things, these notes documented Singh's plans to harass A.B., and several of the notes tracked precisely language that he subsequently used in harassing social media posts or messages. As just one example, a July 7, 2020 "online" to-do list of sorts, read: "Bully [G.D.] more / reiterate [racial slur] facial features (proof physical) / Promote like tweet 10000x / 100x More reciprocation from the b****s ugly friends . . . . Beat up family if I see them ever anywhere / take pics of [A.B.] irl make fun[,] verbal abuse direct not indirect to [A.B.]." The notes also contained A.B.'s personal information, including her address, email addresses, parents' names, and phone number.

### Singh's Cyberstalking Campaign Against Victim 2

Singh's cyberstalking and harassment campaign also targeted G.D., also a Maryland resident, who Singh perceived to be a romantic rival. As he did with A.B., Singh created numerous social media accounts intended to harass and intimidate G.D., several of which incorporated G.D.'s name. A common theme of the accounts and their postings was to denigrate G.D.'s character and appearance; as just one example, Singh created an account under G.D.'s true name and included the caption, "Loser Ugly Broke [Homophobic Slur]." Singh also used the accounts to post pictures of G.D. and "dox" him.

Singh, intending to intimidate and harass G.D., also used electronic accounts to express his desire to physically harm G.D. On or about July 18, 2020, Singh, using an anonymous social media account that he created, posted a video, in which an unidentified person is seen knocking on the front door of a residence in Baltimore, Maryland, where G.D. previously lived (apparently believing G.D. still lived there). Singh "tagged" G.D. in the social media post, telling him to answer the door. Singh later posted the same video to YouTube, which included G.D.'s name, the real address of G.D.'s former residence, and Singh's statement that he went to that location to fight G.D. Later, when investigators searched Singh's phone upon his arrest, they found, among other things, (1) the aforementioned video with metadata indicating that the video had in fact been recorded in Baltimore, where G.D. had lived; and (b) a July 24, 2020 note, titled in G.D.'s name, which listed G.D.'s former address and stated, "He's poor ahahahaha I went to this ugly kids house to slap the s*** iut [sic] of him (have recording) and he didn't open the door LMFAOOO."

**Conclusion**

The Defendant agrees that he used the mail, an interactive computer service, or electronic communication service or electronic communication system of interstate commerce to engage in a course of conduct that caused, attempted to cause, or reasonably would be expected to cause substantial emotional distress to A.B. and G.D., and that he did so with the intent to harass or intimidate A.B. and G.D.

SO STIPULATED:

*[signature]*
Christopher M. Rigali
Assistant United States Attorney

*[signature]*
Desmond B. Singh
Defendant

*[signature]*
David W. Fischer, Esq.
Counsel for Defendant